### Illinois Central Railroad Company v. T. L. Bailey.

1. PEREMPTORY INSTRUCTION—*when should be refused.* A peremptory instruction for the defendant should be refused when there is evidence tending to prove all that is required to warrant a recovery.

2. FIRE COMMUNICATED BY LOCOMOTIVE—*what establishes prima facie case.* Evidence which shows or tends to show that the fire in question was caused by sparks from the defendant's locomotive, establishes a *prima facie* case.

3. INCOMPETENT EVIDENCE—*what cures erroneous admission of.* The erroneous admission of evidence is ordinarily cured by striking the same and directing the jury to disregard it.

Action on the case for fire alleged to have been communicated by locomotive. Appeal from the Circuit Court of Jackson County; the Hon. WARREN W. DUNCAN, Judge, presiding. Heard in this court at the August term, 1905. Affirmed. Opinion filed March 22, 1906.

W. W. BARR and F. M. YOUNGBLOOD, for appellant; J. M. DICKINSON, of counsel.

WILLIAM A. SCHWARTZ, HOSEA V. FERRELL and ANDREW S. CALDWELL, for appellee.

MR. JUSTICE CREIGHTON delivered the opinion of the court.

This was an action in case, in the Circuit Court of Jackson County, by appellee against appellant, to recover for the destruction of a store building and stock of merchandise by fire occasioned by negligence on the part of appellant. Trial by jury. Verdict and judgment in favor of appellee for $5,000.

The declaration charges in substance, that by reason of

negligence of appellant in allowing sparks to escape from one of its engines, a frame building in the village of Makanda, designated "the Rendleman building," was set on fire and that this fire spread from the Rendleman building to adjacent buildings, consuming among others appellee's store building and its contents, consisting of a stock of general merchandise.

It is conceded that about nine o'clock in the forenoon on October 10, 1899, a fire started in the Rendleman building in the village of Makanda and spread from that building and did consume appellee's store building and its contents, and no question is raised here as to the value of appellee's building or of its contents, or as to the amount of loss sustained by him on account of the fire.

Counsel for appellant insist that the trial court erred in denying their "motion to exclude all the evidence from the consideration of the jury," and in refusing to instruct the jury to find appellant not guilty.

It is now the settled law of this State that "when there is evidence tending to prove all that is required to warrant a recovery, the court should submit the case to the jury." St. Louis National Stock Yards v. Godfrey, 101 Ill. App. 40.

The weather was hot and dry; a high wind was blowing from the southwest towards the northeast; the Rendleman building was an old one-story building, thirty-two feet wide, fifty to sixty feet long and covered with an old shingle roof, and it stood in a row of buildings along the east side of appellant's track about forty feet from its right of way, fronting towards the railroad. Back and east of this row of buildings was a hill 148 feet high, above the level of the railroad track. The Rendleman building was unoccupied at the time and had been for a number of days. In this same row of buildings stood a brick building designated as the "Bell building," and the Rendleman building stood next to it, about four feet north of it. The Rendleman building had a square front extending up a little above the comb of the roof, called by the witness a "Jackson front."

As to the origin of the fire, a Mrs. Lane testified that she lived about a hundred feet north of the Rendleman building and that there was nothing between her building and the railroad track to obstruct the view. She says that she heard the nine o'clock south-bound passenger train and that it stopped. She further says, as abstracted by counsel for appellant: " I heard the train making an unusual noise, puffing and buzzing the wheels, and I went out on the porch, at the south corner of it, and watched it until it moved out. I could see the engine; it was not far from the standpipe, between the standpipe and the depot. When I went to the front porch the train was wheezing around and puffing cinders and smoke; it went over and lit on Bell's porch and from there I could not see it. I saw sparks falling on Bell's brick and in the alley. I could not see on the house for this Jackson front. * * * It was big pieces of fire. The wind was very high from the southwest, blowing very hard northeast. The fire was going east from the train when I saw it." She further testified that it was not over fifteen minutes after this till she heard the alarm of fire, and she went out at the back door of her house and saw the fire blazing in the roof of the Rendleman building; " it was as big around as that chair bottom."

Mr. Hopkins, the postmaster, testified that he went to the train that forenoon, about nine o'clock, and that in starting to pull out "the engineer put on steam, which caused the wheels to slip on the track and throw out considerable cinders and fire and it fell on us a little northeast of where the engine was. The wind was blowing from the southwest. * * * The engine was spinning four or five seconds trying to start. * * * My recollection is that there was some fire for the reason that it burned a hole in a fellow's hat that stood by me."

Mr. Carr testified: "I saw the engine when it started; the wheels slipped and the coal cinders fell here where I was walking. I was coming right along here by the Ren-

dleman building.  *  *  *  I discovered they were falling around pretty thick."

Mrs. Wilson lived in a house on the side of the hill back of the row of buildings and quite up above them, "up above the roofs of the houses," so that she could look down on them. She testified: "My house fronted the west; * * * I was setting in my door the morning of the fire, saw the passenger train going south come there; she kind of held up there; I was there when the train left town. I was sitting in my door and the sparks of fire and smoke came from every which way, and the wind was blowing hard and blowed it all over town. I could see the roof of the Rendleman building at the time; was looking at the roof; saw the fire or whatever it was light on the roof; it came from the engine, I suppose; lots of it showed on the roof; could hear the sound of the engine at the time; looked like it was sliding; looked like it was making more fire; * * * the wind was pretty strong; it came from the west, catacornered this way, right over the Rendleman building." Soon after the train left, the fire was discovered and an alarm was given. The estimates of the time that elapsed between the departure of the train and the discovery of the fire differ. They range from ten to thirty minutes. When the fire was first seen, it was blazing up from the roof of the Rendleman building and covered a space of a "half bushel" or a "chair bottom."

The foregoing made a *prima facie* case for appellee. "It was only necessary, in the first place, for the plaintiff below; to establish a *prima facie* case of negligence against the defendant, by introducing evidence, showing, or tending to show, that the fire was caused by sparks from the engine. When such *prima facie* case was made, the burden of proof was then cast upon defendant to * * * overthrow this *prima facie* case by counter evidence as to the cause of the fire or to prove by a preponderance of the evidence that its engine was equipped with the necessary and most effective appliances to prevent escape of fire (the best and most approved spark arrester), in good repair, and that it was

properly, carefully and skillfully handled by a competent engineer." First National Bank v. L. E. & W. R. R. Co., 174 Ill. 36 (43).

Appellant's counter evidence as to the cause of the fire consists of the testimony of one witness, that she saw a light in the Rendleman building late at night, the night before the fire, and that she saw smoke coming from it early that morning; the testimony of a number of experienced engineers who testified that sparks would not live in open air a sufficient length of time to be carried far enough to reach from the railroad track to the building, and that sparks could not be seen in the open air of a clear sunshiny day; the testimony of a large number of persons that they saw smoke coming out at the comb and under the eaves of the building before they saw or heard the alarm of fire the testimony of a number of persons that very soon after the fire was discovered entered the building, saw through the cracks of the ceiling that there was fire above, and tore off some of the ceiling and saw that the upper side of some of the ceiling boards was burning; and the testimony of the train crew that nothing improper or unusual occurred in the management of the train that morning and that they did not observe any sparks coming from the engine.

As to the statement of the witness who said she saw a light in the building the night before, a number of rebutting witnesses testified that from her position, as she stated it, a light in the Rendleman building could not be seen. As to the testimony of the experts who said sparks would not live in the open air long enough to reach the building, and that they could not be seen of a clear day, all that need be noted here is, that there is a conflict between what these witnesses say could not be and what appellee's witnesses say did occur. In such case the question is left within the domain of dispute. As to the smoke that was seen by a number of witnesses, before the fire was discovered, it must be noted that none of these witnesses saw smoke until after the train had left, and none of them saw it more than a very few minutes before the fire was discov-

ered, that the Jackson front and other obstructions would obscure the fire from the range of vision of many of these witnesses until it had attained considerable headway, that it had in fact attained considerable headway before it was discovered by any one, and that it is within the knowledge of all men that in becoming ignited and spreading and getting under headway there probably would be considerable smoke. As to the witnesses who entered the building and saw the fire above, shining through the cracks of the ceiling, it is not claimed that there was any fire in the building anywhere below the ceiling, and the evidence does not tend to show that there was anything between the ceiling and the roof but empty space; the fire first appeared about midway between the east and west ends and near the top of the roof on the south side of the comb; the ceiling was made of boards, and after the fire had reached such headway as to be discovered it spread through the roof very rapidly and by the time the men got any part of the ceiling torn off there was a pretty big fire in the roof, and such fire as appeared on the upper side of any of the ceiling boards most probably had fallen from the fire in the roof. There is nothing at all disclosed to indicate that the fire in the roof sprung from the ceiling.

In discharge of the burden "cast upon" appellant, to prove by a preponderance of the evidence that its engine was equipped with the best and most approved spark arrester in good repair and carefully and skillfully handled, a model of the spark arrester in use on the engine was produced and its mechanism and manner of use explained to the jury, and testimony of experts given to the effect that such spark arrester was the best and most approved one in use; a record kept in the ordinary course of business at Centralia was introduced showing that the engine had been inspected on October 8th, and that it was then in good repair; the engineer and three other employees of appellant testified that they examined the spark arrester after they reached Cairo on the day of the fire and that it was all right, and witnesses testify that it was examined on the 11th, when

it reached Centralia on its return trip, and was found to be in good repair, and as to the handling of the engine the engineer said that it was handled carefully and properly, that the wheels might have slipped a few times, but that was no evidence of any improper handling of the engine, and a number of other experts testified that the slipping and buzzing of the wheels did not indicate mismanagement of the engine.

The model throws no light on the questions as to the state of repair of the spark arrester or the manner of its handling. The model simply shows a perfect appliance in perfect condition. The evidence proves that the "netting" in these appliances is short-lived, is liable to burn out in four or five months and when it burns out "holes will come in" and the sparks are no longer arrested; the evidence does not show how long the appliance in this engine had been in use, but it does show that it was in service between the time it was examined on the 8th and the time of the fire. As to the examination at Cairo, the evidence shows that after the fire was discovered, a telegram was sent to Mr. Jones, appellant's master mechanic at Cairo, informing him of the fire and directing him to examine the front end of the engine, and when the train pulled into Cairo Jones was waiting there with the message. What examination he made and what he did with respect to it, if anything, is not disclosed. He was still living at Cairo at the time of the trial of the case, was not produced as a witness, nor his absence in any way accounted for. The examination made by the witnesses who testified was not made until about three or four hours after they turned the engine into the roundhouse at Cairo, and they were not at the roundhouse from the time they turned it in until the time they examined it, three or four hours afterwards. And further, all the expert witnesses on both sides agree that if the engine did in fact throw off sparks that did carry to the Rendleman building and set it on fire, then there was something wrong either with the spark arrester or with the handling

of the engine, and this brings us back again to a conflict of evidence.

We are of opinion that the trial court did not err in submitting the evidence to the jury, and we find nothing that will warrant us in disturbing the finding.

A certain witness testified in rebuttal to seeing sparks thrown from another engine at another time. At the close of this witness's testimony counsel for appellant, having objected to its admission as it was given, moved the court to exclude it. The court sustained the motion and instructed the jury not to consider his evidence. Counsel contend that notwithstanding the fact that the court excluded this testimony and directed the jury not to consider it, still the admission of it in the first instance is such error as to make it the duty of this court to reverse the judgment. In this view we cannot agree with counsel. If it be conceded that the trial court erred in the first instance in admitting this evidence, we think that the error was fully cured by its exclusion and the instruction of the court to the jury that they should not consider it.

The only remaining question is as to the first and second instructions given on behalf of appellee. We think these instructions correctly state the law applicable to the case, and that they are in no sense misleading. They are in strict harmony with our views of the law as disclosed in the foregoing analysis and discussion of the case.

We find no material error in this record. The judgment of the Circuit Court is affirmed.

*Affirmed.*